Good afternoon, your honors. I'm Robert Powell on behalf of the petitioner Javier Martinez. I would like to reserve two minutes of time by way of rebuttal. We have made three arguments why the decision made by the Board of Immigration Appeals should be reversed. First, on the Convention Against Torture claim, the board missed or did not take into account a significant threat that Mr. Martinez faces, whereas he's deemed to be an opponent of the Ortega regime. That was just overlooked. Second, the motion to continue that was denied was done, the board failed to follow the governing president decision in matter of Sanchez Sosa. And third, the board refused to consider a request for administrative closure. That is inconsistent with the recent decision, the matter of Cruz Valdez, the precedent decision issued by the Attorney General. I'll begin with that third argument, and in particular with the issue about whether or not Cruz Valdez should be applied retroactively. The relevant regulation in place, which is HCFR section 1003.1D, provides that the board may take any action that is appropriate and necessary for disposition of the case. Now, that authority has... How would continuing, I mean, we're not talking here about the motion to continue, that's a separate argument. Correct. How would administrative closure further the agency's effort, given that the agency has already denied the continuance? What reason is there for the agency to put the case on the shelf? Well, there's a collateral application that's pending, the application for the U visa. That's a very important benefit. That was the basis for the motion to continue. And if the agency's decided that, no, that's not got enough a chance to succeed, we're not going to continue the case. If it's not going to continue the case, I don't understand what possible reason the agency could have for closing the case. Well, first of all, first of all, the, there are different standards that are applied with respect to a matter of continuing. You've argued that, but why? But why? Now, take my premise. And I know you've got an interest in addressing that now. Suppose the agency has decided not to continue, which it did, and we don't set that aside based on our review, what possible reason could there be to close the case? You can tell me there are different standards, but that still doesn't give me a reason why the case should be closed. Well, if the case is continued, one of the problems with that, the board says, is that that can lead to inefficiencies because it keeps coming up on the calendar. If it's continued. But remember, my premise is the case is not continued. If the agency doesn't continue it, why should it be closed? Because that takes it off the calendar and they don't have, they don't have to deal with the case. It's off their calendar. They've finished. They've denied the motion to continue. They've dismissed the appeal. As far as the agency's concerned, this case is done, which is why you can be here. So why should the agency close the case? Well, not only is the agency there to, you know, issue deportation orders, but also to allow individuals to obtain benefits that they're entitled to under the statute. Yeah, but they can, and they considered that in considering your motion to continue, and they denied that motion. So I still can't figure out why it is, if the agency decides that it's not going to continue the case, what's left for administrative closure? Because the agency would not want to deport somebody to a country where that person is going to be persecuted when he has benefits. The agency's already decided that's not likely to happen. No, no, that's not correct, Your Honor. The agency decided that it is likely that he will be persecuted. There's a distinction between the torture and the persecution. Stop. Stop. You're not here to re-argue. I mean, and that's part of your first argument. I understand that. But I'm saying if the agency's made the decisions that it made, which include denial of your application for cat relief, and he's not currently eligible for anything else, and they've denied the motion to continue, what's left? He's eligible for a U visa. Sure, but they denied the motion to continue, which was styled on his application for a U visa. Are you suggesting, counsel, that maybe the reason why the agency denied the motion for continuance was to avoid the administrative inefficiency, and that was the driving force which might not apply to administrative closure? Is that what you're arguing? Yes, that's exactly correct. Whereas this concern about administrative efficiency may be a reason for denying the motion to continue, that's not a reason for denying the administrative closure. That's clear in the matter of a TCN, a precedent decision by the board, where it may be appropriate to administratively close the case where the person has collateral benefits, even though the person may be deportable from the United States. So, counsel, when the BIA denied closure, it applied Castro-Tum, which was the binding law at the time. So why would we need to remand it just because they later changed the law? Yeah. So the Castro-Tum was a decision issued based on its legal interpretation of the regulations. So Castro-Tum said, you know, not as a matter of a policy decision, a general policy decision, but as a matter of legal interpretation, the regulations do not allow for administrative closure. And that decision was then overturned by, well, three different circuit courts on the legal analysis of the case. In other words, and then subsequently by the Cruz-Valdez case, what those cases hold is that Castro-Tum is legally incorrect as a matter of regulatory interpretation. What that means, and this is in the Meza-Morales case, for example, where Justice Barrett, when she was on the Seventh Circuit, said what that means is that those regulations, there's a single correct way to interpret those regulations. You know, that's before Castro-Tum and after Castro-Tum, that interpretation, that legal interpretation is consistent, I'm sorry, is consistent throughout. And what that means... Is the governing standard, though, counsel, for determining retroactivity or not? Would you say that the Montgomery Ward factor is applied because it's administrative? No, I wouldn't. And the reason is, you know, it comes out in the Meza-Morales case where there's a single correct interpretation of that regulation, you know, which is before Castro-Tum and after Castro-Tum. It's not the situation where you look at this regulation and apply the Montgomery Ward factors where there's some ambiguity in the regulation or in the statute. And so the board is called on to use its policymaking powers to interpret the, and appropriately so, where there's a gap in the statute or the regulations. The board can make policy A or policy B. And if it changes policy, then these Montgomery Ward factors come into play and you have to figure out whether that new policy, which appropriately overturns a prior legitimate policy. You know, you balance the reliance factors and the other factors in Montgomery Ward. That does not apply in the situation where the statute is clear and unambiguous or the regulation is clear and unambiguous. There's one single interpretation of that regulation that applies throughout. What that means is that when Castro-Tum decided that, it's not like it was making a legitimate policy decision. And if you read... Is the authority for what you're saying, that we have no discretion, essentially? Yeah. So I would say the three different circuit courts that have overturned Castro-Tum. So the main... But I mean, what's the precedent that we have no discretion of sending it back or just saying Castro-Tum was the law at the time it was decided? Well, I don't know that there's a particular precedent that I can cite on that, but where the board makes a legal error in denying a request for a benefit, then that, you know, the case is, I guess, under the Ventura case of the Supreme Court's decision in Ventura, where the agency makes a legal error. The court ordinarily sends it back to the agency for the agency exercise discretion or make a decision without that error. So you're saying we basically have to find that Castro-Tum was wrong on the merits? Yes, that's exactly the point of Mesa Morales, the Romero case out of the Fourth Circuit, and the Arcos-Sanchez case out of the Third Circuit, and also the Cruz-Valdez case by the Attorney General. All of those are saying that Castro-Tum was legally incorrect. I think there's some judge that disagrees with that. I think I saw dissent saying that that's wrong. But that suggests that the Attorney General's decision, Cruz-Valdez, doesn't mean much. We have to look de novo back at Castro-Tum and say, no go. That's what you're asking? Which is exactly what the Mesa Morales case did and the other case, Romero and Arcos-Sanchez. I do have just a few seconds. I know, and I do have another question, if we could take you over. On the, on your, you mentioned that the BIA overlooked a political opinion argument in the Cat claims. Is that right? It overlooked, so there's a distinction between Cat claim, which involves a, a, a risk of torture, and a withholding of removal claim, which involves persecution. Right. It's, it's been established that if Mr. Martinez is sent back to Nicaragua or Costa Rica, it's more likely than not that he would be persecuted. Now, that's different from torture, and I think... I, I understand that. My, my question is one of your arguments on, on appeal was that the, the BIA overlooked the, the, the fact that the political opinion basis nexus... Oh, I'm sorry. Yeah, the Ortega nexus, essentially. The, yeah, about Ortega. Correct. The risk that he faces from Ortega. Right. That was... And, and so my question, was that raised to the BIA? I didn't see it in your appellate brief. Oh, yeah, yes, it was raised to the BIA, and I can point to the administrative record. I believe that was, actually, page nine is where our appeal brief was in the administrative record, and pages 14 and 19, we argued that, to the board, that he faces, you know, a risk because he's, he would be deemed to be in opposition to President Ortega. You think that was sufficient to put the board on notice? Yeah. That the IJ neglected the political opinion claim? I believe so, yeah. I mean, that we, that was raised in page 14 and page 19 again, and, and cited also supporting documentation showing that people in that situation are being, you know, arrested, put in prison, and tortured. Can I just ask one quick question? Back to that first issue about the difference between continuance and closure. Is there anything in the record that suggests that the BIA was motivated in denying continuance on the inefficiency problem? That was a factor? Is there anything that indicates? Yes, I believe that, and I don't have it on my fingertips, but I believe in the board's decision, the most recent one. One of the things it says is that, you know, one of the factors on the continuance is the administrative efficiency. It has a parenthetical remark there with a couple points about what administrative efficiency involves. And that's how you would distinguish closure versus continuance? Yes, yes. One, for example, the due diligence issue applies on continuances, but it's not at all applied in administrative closures. I got to say, I haven't been persuaded yet on this, so I want to give you an opportunity to speak to it. From the agency's perspective, it's finished the case. What does the agency have to gain by closing it administratively as if it's going to come back in the future? Because from the agency's perspective, they're done. Yes, they may be done, but and maybe it doesn't have to do so. Maybe it doesn't have to do anything more than administratively close the case, which they should have done under the. All that would do would prevent a petition for review being filed with us. They're finished with the case. We administratively close lots of cases, but not when we've finished whatever we're going to do with it. If there's something that we might want to consider in the future, we'll grant a motion to continue. But the agency denied the motion to continue. So I'm still adrift as to what it is from the agency's perspective is to be gained by granting administrative closure. Well, the agency not only is there to deport people, but to ensure that people get benefits. And so the agency, by administratively closing the case, can allow, which it should do under the precedent decisions, allow Mr. Martinez a chance to get this benefit that's crucial for him, that will allow him to avoid being persecuted. What we know will happen to him. And isn't that exactly the argument that was made to the agency in seeking continuance? But the agency did put aside. It said incorrectly that this issue about persecution isn't relevant. Okay. We'll give you your two minutes back. Thank you so much. Hear from the government now? Yes. Good afternoon. May it please the court. This is Dana Camilleri for the Attorney General. I'd just like to start by addressing the court's order from last Friday. It's the government's position that matter Cruz Valdez does apply in this case and applies retroactively. I guess I would also note, because it was my prior case, the case that was before the Ninth Circuit and had been argued defending Castro Tum was sui sponte remanded by this court after Cruz Valdez, because the assumption was that it did retroactively apply. From our view, however, this is a situation that falls under the futility doctrine. As Judge Clifton has already pointed out, the continuance analysis shows us that the agency has no interest in further delay in these proceedings, that they don't think that he's likely to succeed in his U visa petition, and that this is not in the best interests of the agency. And that was for a more finite delay versus administrative closure, which would be almost indefinite. And as I reached out to the Vermont Service Center this morning, his U visa is still pending and adjudicator has not been assigned to it. And so this is just asking for an indefinite delay for someone who is mandatorily detained. And it's also unclear what that would do to his detention status. But he has exhausted all of his habeas appeals. Well, you believe that there's no the idea that one of the driving factors was the sort of the inefficiencies of the process as a reason why the BIA refused to or declined to continue the matter, which... No. Yeah, go ahead. Sorry, Your Honor. I believe that a reading of the three decisions that we have on this is actually very clear that they think he's unlikely to succeed, that they don't want to keep delaying. And again, he is detained at taxpayer expense at this point. And that, as Judge Clifton pointed out, they're done with the case. They have assessed all of his claims. I know that opposing counsel is citing to his appeal brief, but I looked at that again this morning and I don't see any argument about Ortega or Sandinista, particularly on in his summation of his claims, just as an aside. Well, I do. I mean, I looked at the pages that were just cited to us and both of them mentioned that specifically. It may not be very well developed, but I can't say that it's not there. Okay, Your Honor. I could take another look at that, but our position is that it was not raised as a real, it's kind of a throwaway in his testimony. And the focus has primarily been on the cartels and the supposed cartel involvement with the Nicaraguan police and then the Costa Rica portion, which has to do with his mental health and his drug abuse struggles. What about, to get back to the merits part, it was raised that his, the withholding from removal, 2002, sort of, even though it's old, still stands and that wasn't dealt with really at all, I don't think, by the IJA and sort of conclusively by the BIA. Isn't that significant in some ways, even though it's old and the BIA said, well, there are different circumstances? Nobody ever articulated what exactly those different circumstances are and how do we know they're material, that they've materially changed in 17 years or 20 years? What do we do about that? Well, Your Honor, I think we do know that they changed. He was granted withholding because he had some cooperation after that drug trafficking arrest and he was fearful. He wound up being welcomed back into the drug trafficking operation. And this time he did not cooperate. So he's focused on this appearance of cooperation, but he didn't cooperate at all. So it is a totally different scenario. And he never faced any reprisals from that earlier cooperation. Is it clear that was the basis for the withholding because of his perceived cooperation back in during the first conviction? Yes, Your Honor, that should be in the record. I'm sorry, I don't have the exact page for you. I got to tell you, I was looking for the 2002, was it? And I didn't find it. And so I sort of had the same question. It ordinarily withholding of removal is granted by a similar, more likely than not standard. The key difference is the difference between persecution or well-founded fear of future persecution and torture. And that's an important difference. But the agency didn't articulate what it was that had changed other than 17 years had passed, and it's a different standard. If it is the case, as Petitioner argues, that it was adjudicated and the IJ at the time presumably found, like I say, I couldn't find that in the record, that in fact, it is more likely than not that he would face or had a well-founded fear of persecution. Then I think I have some concern because it suggests that, well, at least at some point in time, the agency agreed that there was more likely than not risk faced by this person. It may not be a risk of torture, but that's not something that's specifically discussed. So what are we supposed to make of the 2002 adjudication? I think that there are, in the papers, I believe, for the motion to reopen, there are references to why the withholding was granted. I agree that the exact decision is not in there, but it is the difference, as I've noted, that he, that was based on cooperation that has not happened. And he went right back to working with them. Stop right there. Based on cooperation, I guess the, I'm projecting, did an IJ say, well, yeah, he's facing more likely than not this risk because he has cooperated, and now time has passed and the next time around he didn't cooperate. But I don't see the IJ in this case talking about that or the BIA talking about that. We're being asked to infer things that I really haven't seen in the discussion. And let me add to that, because I'm giving you a big, it's not a softball, I'm afraid, but a big ball of concerns. And the other piece that I want you to address is the agency's decisions, and I say that to include both levels, speaks of more likely than not in terms of a chain of events. And in particular, in the most recent, after remand, the BIA's decision dated March of last year specifically talks about what will happen due to his drug addiction, and he says, failed to demonstrate that due to his drug addiction, he will more likely than not suffer torture. But our case law says that if there are multiple sources of risk, we have to consider the aggregate risk. The chain of events all leads down one path, and it's the petitioner's obligation to show each step more likely than not. But if there are aggregated risks of different kinds, then the chain of events analysis doesn't help us because you have to consider if you've got a 25 percent chance of this and a 30 percent chance of that and so forth, you add the pieces up. Is there any place in the decisions before us where the agency has discussed that or added the pieces up? Because the only discussion I saw was this chain of events, and it seems to me that that petitioner has presented different kinds of risk. So this last one, for example, how does the drug addiction risk fit in with the Ortega regime risk or the cartel retaliation risk? Well, your honor, I think a very important point in this case is that he is claiming for CAT, he has to show that he can't be removed to either Nicaragua or Costa Rica. In Costa Rica, he has provided no evidence that the cartel operates there or that there's any corruption in the government. And he provided no evidence that his drug addiction was going to lead to him being tortured in Costa Rica. So I think the agency took each country in turn, and they did look in the aggregate for Nicaragua. And I would say that there's a little bit more to his claim there. There's simply nothing for Costa Rica. And I think that's part of the confusion. The drug abuse is part of the Costa Rica piece to try to say that he wouldn't have access to care, even though the country conditions belie that point. And then for Nicaragua, he's arguing that the cartels operate with impunity and work with the police, which the agency did consider. But there was no background country condition evidence showing that Sinaloa cartel even operates in Nicaragua. They operate in Mexico and the Philippines. And so I think it was kind of complicated by the two country analysis, but that the agency did conduct the analysis it needed to do. But the withholding in 2002, the grant of removal made a finding with respect to both Nicaragua and Costa Rica, did it not? Yes, but that is an entirely different standard for relief. I understand that, but there had to be some finding is more likely than not going to be persecuted in Costa Rica as well as Nicaragua. So there must have been something there. You say that we should note that there's no evidence of cartel activity or somebody, some IJ must have found or BIA found some kind of risk in order to grant that withholding, at least in 2002. So that sort of underscores why didn't the IJ and the BIA at least talk about it and deal with exactly what were the circumstances found then that are different from now? Well, your honor, I think they had once the proceedings were reopened, they had the country conditions evidence that is for today for when these proceedings happen. And that's the relevant country conditions evidence. They don't need to go back and look at 2002. If he had not been convicted of his second drug trafficking convictions, they wouldn't even be there. But once the motion to reopen was granted and withholding was terminated, it's not really relevant to the present inquiry. So the 2002 withholding is completely irrelevant in your view? Yes, it was an entirely separate proceeding. It's not before this court. He didn't. I mean, we haven't had any discussions in any of the appeal briefs about the motion to reopen a motion to terminate. He conceded that he was no longer eligible for withholding because his drug trafficking conviction is clearly an aggravated felony. So all of that has sort of been resolved. And the question is just whether he has shown that he merits CAT and he has not. But if there was a fear in 2002 that there would be some persecution based on his activity and cooperation, whether it's connected to the Sinaloa cartel or somebody else, that seems like a fairly factual, specific factual issue that one would want to know, not just looking at a country conditions report, but one would want to know, have things changed on the ground since then? It's hard to understand how this is completely irrelevant. Well, Your Honor, I mean, in that case, then it's his responsibility to show that he merits relief. So he could have provided those documentations. It's not on the government to show that he is more likely than not to be tortured, and he failed to do so. Unless my colleagues have any other questions. Okay, we'll hear for rebuttal. We're making everybody work overtime today. Thank you. Yes, regarding the withholding of removal that was granted in 2002, I mean, it's been determined that if Mr. Martinez is sent back to Nicaragua or Costa Rica, he will likely be persecuted. That hasn't changed. We made that argument in the briefing. It was determined in 2002. That was determined in 2002. It doesn't tell us necessarily what's the case in 2020 or 2021 when these decisions were made. 2019, I guess. Yeah, but the situation is similar. In particular, I mean, we had submitted in our pre-hearing statement and page on the certified administrative record, pages 1379 and following, there must be about 40 or 50 pages of documentation going back to 2002, showing what the situation there was, which shows some of the reasons why he was granted withholding back in 2002. I guess what I don't understand. I think your argument is that the BIA needed to consider the withholding of removal in That's just extraneous to the merits of your case today. The merits of your case are the political opinion, the cartels, the homelessness, and the BIA denied all of that. Yeah, but it's not the fact that... So in making a decision on Convention Against Torture, the board is supposed to consider all relevant evidence, including human rights conditions in the home country, persecution in the home country. What we've shown, what the record reflects, is that Mr. Martinez would likely be persecuted if he's sent back. But the BIA disagreed with that. I thought your argument is solely that the BIA needed to take into account that they granted withholding removal in 2002. Yeah, to the extent that the board said that there are changed circumstances, that's a factual conclusion that doesn't have... that the immigration judge never made. And so that's inappropriate for the board to make that factual determination when the immigration judge... Why is that relevant if the board made a conclusion on all the claims that you're presenting today and denied them all? What happened in 2002, why is that relevant? Well, it's on the board. So given that it's likely that he's going to be persecuted if he's sent back, the board has an obligation to explain why he would be persecuted but not tortured. This is sort of like an issue preclusion argument. Having adjudicated the IJ, presumably, because I still haven't read what the IJ said, but having adjudicated the risk of persecution question in 2002, the IJ, I infer, came up with a finding that he was more likely than not at risk of persecution. And so do I hear your argument correctly to say if that's different today, then there's an obligation on the part of, presumably, the IJ in the 2019 proceeding to say what's changed? Right. And if she has not... and she didn't make that determination, the board then can't make that factual finding and say, oh, there's something different now, the conditions now are different than before. Well, I can point out that it's a different question today, that he was more likely than not to face that risk in 2002 is a different question than the question as to whether he's more likely than not to face risk of something in 2019. That may be fair to say it's a different question. But what's not fair for the board to do is to say, oh, we find that the conditions now, that's not relevant because the conditions now are different from what they were in 2002. Are you saying that an inference can be drawn from the 2002 decision that would apply here today, assuming, for instance, that the same conditions that obtained back then might affect the decision today? That's part of your argument, I take it? Yes. I mean, that's one of the factors that needs to be considered. You know, it's... So who has the burden of proving either that conditions have changed? Is there a burden shifting thing here where if a condition was found in 2002, you sort of presume that some of that has relevance here and should be considered, and therefore the burden is on the decider to say, no, it's no longer relevant. Those are different things have changed. Or is the burden on the petitioner to say, yeah, these are the same conditions that 17, 19 years ago. That's not... It's not an anachronism. It's still... And here's why. Who's got the burden? I guess it's not clear to me who has the burden in that situation. But what I can say is that we submitted evidence of the conditions in 2002 and the conditions currently with what's going on with Ortega. Is there a tie between those two? Do you... Showing that they're similar situations. Yes. What's happening today is similar to what was happening in 2002. What's an example of what is happening today that was similar to the 2002? People who are deemed to be against the Ortega regime being arrested and put in prison and tortured. But that wasn't a basis for the 2002 withholding. There was information in there, an Amnesty International report, which I don't have the exact site, but it should be in the pre-hearing statement that we submitted beginning on page 1379. That Amnesty International report that was used in 2002, that talks about torture by the national police in Nicaragua in 2001. Is there some indication that's why there was a withholding of removal in 2002? All we have in the record is the immigration judge checking a box saying withholding granted. If I can make just one last point on the issue about motions to continue an administrative closure. As we argued before, Mr. Morales is entitled to apply for the U visa collateral relief. The board made a mistake in denying administrative closure. In that circumstance, what a Fourth Circuit decision, Gonzalez versus Garland, that came out in 2021-16, F4-131, where the Fourth Circuit said it was appropriate for the board to deny a motion to continuance, but not appropriate to deny the administrative closure and sent back to the board to consider administrative closure because it made a mistake in denying administrative closure. Will that answer my question why? Because I don't understand the logic. Okay. All I can say is that if the standard for administrative closure is applied properly, I believe that Mr. Martinez should have a chance for that. It should be granted given the circumstances. Thank you, counsel. This case will be submitted. Thank you.
judges: CLIFTON, BUMATAY, Chen